1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10

11   GAYE HERTAN,                          No. CV 14-5331 PA (SSx)

12            Plaintiff,                    FINDINGS OF FACT AND
                                           CONCLUSIONS OF LAW
13        v.

14   UNUM LIFE INSURANCE COMPANY
     OF AMERICA,
15
              Defendant.
16

17

18

19        This is an Employee Retirement Income Security Act ("ERISA") action for recovery

20   of partial disability benefits.  Plaintiff Gaye Hertan ("Plaintiff" or "Hertan") seeks benefits

21   under a group insurance policy (the "Policy") issued to Seyfarth Shaw, LLP by defendant

22   Unum Life Insurance Company of America ("Defendant" or "Unum").

23        After providing Plaintiff with an opportunity to conduct limited discovery concerning

24   the potential conflicts of interest under which Unum's medical experts may have operated.

25   Plaintiff has requested that the Court take judicial notice of Unum's discovery responses.

26   (Docket No. 60, Attachment No. 3.) Although Unum disputes the relevance of the evidence,

27   it does not object to the Request for Judicial Notice.  The Court therefore takes judicial

28   notice of Unum's interrogatory responses.  See Mongeluzo v. Baxter Travenol Long Term

1  Disability Benefit Plan, 46 F.3d 938, 943 (9th Cir. 1995) ("We agree . . . that new evidence
2  may be considered under certain circumstances to enable the full exercise of informed and
3  independent judgment. . . .  'Consequently, we adopt a scope of review that permits the
4  district court in its discretion to allow evidence that was not before the plan administrator.
5  The district court should exercise its discretion, however, only when circumstances clearly
6  establish that additional evidence is necessary to conduct an adequate de novo review of the
7  benefit decision.'") (quoting Quisenberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1025
8  (4th Cir. 1993)).[1]

9        Unum filed the Administrative Record ("AR") (Docket No. 37).  Following the filing
10 of the parties' Opening and Responsive Trial Briefs, the submission of their respective
11 Proposed Findings of Fact and Conclusions of Law, and their objections to each other's
12 Proposed Findings of Fact and Conclusions of Law, the Court, sitting without a jury,
13 conducted a bench trial on June 9, 2015.

14       Having considered the materials submitted by the parties and after reviewing the
15 evidence, the Court makes the following findings of fact and conclusions of law pursuant to
16 Federal Rule of Civil Procedure 52(a).  Any finding of fact that constitutes a conclusion of
17 law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a
18 finding of fact is hereby adopted as a finding of fact.

19 **I.**    **Findings of Fact**

20       1.    This is an action for recovery of long term disability benefits under ERISA.
21 This Court has jurisdiction of this matter pursuant to 29 U.S.C. §§ 1132(a), (e), (f) and (g),
22 as well as 28 U.S.C § 1331.

23       2.    Venue is proper in this district because a substantial part of the events giving
24 rise to the claim occurred within the Central District of California.  28 U.S.C. § 1391(b)(2).

---

26 [1]    Information concerning the remuneration received by the physicians employed or
27 retained by the administrator, although not part of the administrative record, is known by the
administrator at the time the administrator makes its benefits determination.  In that sense,
28 the claimant is not attempting to augment the administrative record with "new" evidence that
an administrator could not have considered when it rendered its initial determination.

3.      The parties have stipulated that the trial of this action is subject to the Court's de novo review.  (Docket No. 24.)

4.      Plaintiff is a practicing attorney and has been employed by Seyfarth Shaw in its Los Angeles office since 1993.  (AR 005.)  Prior to her disability, plaintiff's monthly earnings were $20,833.34.  (Id.)  She was classified as "Senior Counsel" to the Firm.

5.      According to the job description Unum requested from Seyfarth Shaw, the position of "Senior Counsel" requires managing client matters without supervision and performing legal work at a level similar to experienced Income Partners or Equity Partners.  (AR 282.)  Hertan was responsible for advising and representing clients in "all aspects of labor and employment law."  (Id.)  Her focus was to include issues involving FMLA and state statutory employment laws.  (Id.)  She was expected to commit the time, both billable and investment, to meet and exceed firm expectations.  (Id.)  She was expected to "have established a consistent record of delivering excellence and demonstrated a sustained record for solving complex problems in the delivery of legal services to the benefit of firm clients."  (Id.)  As a Senior Counsel, Plaintiff was also required to exhibit superior judgment and assume responsibility for results.  (Id.)

6.      For attorneys such as Plaintiff, the Policy defines "disability" as:

You are disabled when Unum determines that:

•       you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

•       you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

(AR 151.)  The Policy defines "regular occupation" to mean "the occupation you are routinely performing when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."  (AR 171.)

1        7.      Plaintiff had been ill for several months prior to her disability.  (AR 195.)  In

2  early October 2010, she had been experiencing headaches for several days.  On October 6,

3  2010, while at work, Plaintiff became dizzy and nauseous and threw up in the building

4  lobby.  She was unable to drive home and called her husband to pick her up.  The next day,

5  she went to the Emergency Department at St. John's Hospital and was diagnosed with a

6  large brain tumor (meningioma).  (Id.)  She had surgery to remove the tumor on October 8,

7  2010.  (AR  313.)  During the surgery, her neurosurgeon, Dr. Daniel Kelly, removed the

8  tumor and inserted plates and screws in her head.  (AR 313-16.)

9        8.      Hertan was discharged three days after her surgery.  (AR 309.)  Following her

10  discharge, she reported that her headaches had significantly decreased, but as of October 19,

11  2010, she was still taking prescribed narcotics, including Percocet, for the headaches she

12  was still experiencing.  (Id.)

13        9.      Dr. Kelly recommended that Plaintiff not work from October 7, 2010, through

14  November 28, 2010.  (AR 563.)  Plaintiff returned to work on a part time basis on November

15  29, 2010.  (AR 068.).  Dr. Kelly recommended that Hertan be limited to light duty, and work

16  no more than 50 to 70% of her prior work capacity from November 29, 2010, through March

17  2, 2011.  (AR 563.)

18        10.     Dr. Nancy McLaughlin, an associate of Dr. Kelly's, examined Plaintiff on

19  January 11, 2011, for a three-month follow-up.  (AR 307.)  During that examination, Hertan

20  reported "superficial pain in the right retromastoid area" that occasionally woke her up at

21  night and had been getting worse.  (Id.)  Plaintiff was taking Tylenol and Percocet for the

22  pain.  (Id.)  Dr. McLaughlin reported that Plaintiff was "doing very well" and instructed

23  Hertan to make sure that her work schedule remained light for the next few weeks.  (Id.)

24        11.     Dr. Kelly referred Plaintiff to Dr. Sheldon Jordan, a neurologist, for treatment

25  of her persistent "peri-incisional" pain.  (AR 379.)  Hertan's first appointment with

26  Dr. Jordan occurred on March 1, 2011. (AR 261.)  Dr. Jordan prescribed Percocet for

27  Hertan's pain.  (Id.)  Plaintiff continued to treat with Dr. Jordan for her pain and in a follow

28  up visit in May 2011, Dr. Jordan continued to prescribe Percocet.  (AR 260.)  Dr. Jordan's

records documented his findings as occipital neuralgia.  (Id.)  Dr. Jordan restricted Plaintiff to part time work (working no more than 4 hours a day).  (AR 249.)

12.    Seyfarth Shaw continued to pay Hertan her full salary until May 2011.  Plaintiff made a claim for long term disability benefits to Unum in May 2011.  (AR 066.)  Seyfarth Shaw confirmed that it had reduced Hertan's pay to 60% of her normal pay.  (AR 275.)

13.    During a telephone conversation with Unum on June 3, 2011, Plaintiff reported that she was taking the pain medications meloxicam, endocet (Percocet), and Lyrica.  (AR 196.)  During this same phone call, Unum asked Hertan if she was experiencing side effects from the medication.  Hertan reported that the medication made her tired and a little dizzy.  (Id.)  She also reported that her head pain increased with her activity and that it had been difficult to work because her occupation required her to focus.  (Id.)

14.    In a follow up telephone call between Unum and Hertan on June 7, 2011, Hertan reported that she could not work at all on some medications.  She reported that the endocet made it hard to focus.  (AR 248.)

15.    Unum conducted roundtables of claims personnel to assess Plaintiff's claim on June 22, 2011, and June 27, 2011.  (AR 286, 348.)  Unum's claims personnel concluded, based on their review of the records, that is was unclear why Plaintiff was unable to return to work full-time.  (AR 348.)

16.    Unum referred the matter to Dr. Sabrina Hammond, an in-house medical consultant, for a peer contact with Dr. Jordan.  (AR 363, 371-72.)  Dr. Hammond asked Dr. Jordan if he thought Hertan was "physically capable of her previous level of functional activity" and, if not, to explain the rationale for his opinion, treatment plan, and prognosis.  (AR 372.)

17.    Dr. Jordan responded to Dr. Hammond's inquiry on July 25, 2011.  (AR 375-77.)  According to Dr. Jordan, Plaintiff was not physically capable of her previous level of functional activity due to constant neuralgias.  (AR 377.)  Dr. Jordan opined that the surgical

removal of the menigioma required moderation and caused limited concentration and daytime capacity. (Id.).

18.  Unum approved plaintiff's claim under a reservation of rights on July 29, 2011.  (AR 405.)  Unum then requested that an in house physician, Dr. David Lezberg, review the claim.  (AR 414.)

19.  Dr. Lezberg confirmed that restrictions and limitations were supported.  (AR 418.)  His stated conclusions were:

- Ms. Hertan was experiencing post craniotomy neuropathic pain that was termed occipital neuralgia by her physician, Dr. Sheldon Jordan.
- The exact incidence of neuropathic pain following a craniotomy is unknown, but is low.
- In patients experiencing such pain, the examination of the area is usually normal.
- There are no diagnostic tests for this condition.

(AR 418.)

20.  Dr. Lezberg further stated:

The Insured has a reason for developing neuropathic pain.  The Insured had a craniotomy which required a more complex and intricate repair of her skull base defect, including extra drilling of the mastoid air spaces and also dural closure and reconstruction.

(Id.) Dr. Lezberg stated that he interpreted plaintiff's "prompt return to work" as indicating that she was motivated to work.  (Id.)  Dr. Lezberg further concluded that it was reasonable to support restrictions and limitations until approximately 12 months post surgery.  (Id.)  At that time, if the condition did not resolve, he would "expect to see a more aggressive treatment approach with additional medication trials, local injections, and referral to a pain management specialist."  (Id.)

21.  Based on Dr. Lezberg's report, Unum lifted the reservations of rights and accepted liability for plaintiff's claim on August 4, 2011.  (AR 426.)

1    22.    On or about November 22, 2011, Unum had an "update call" with Hertan.

2    (AR 468.)  The record of this conversation in the claim file states that during this call, the

3    Unum representative asked Plaintiff if she was still taking endocet.  The documentation of

4    this telephone call indicates that Ms. Hertan advised that she was taking more of it and that it

5    was hard to function on it.  (AR 470.)  The representative advised Hertan that her medical

6    records would be ordered and that there would be a follow up in two to three months.  (Id.)

7    23.    Unum received medical records from Drs. Kelly and Jordan in December

8    2011.  (AR 513, 536.)  Dr. Kelly's records showed her twice yearly visits and that as of

9    November 2011, Plaintiff's main complaint was "right occipital pain."  (AR 525.)  Hertan

10   told Dr. Kelly that she rated her pain as 3 to 5 out of 10, that the pain worsened during the

11   day, and was relieved by Percocet, which she would take late in the day.  (Id.)  Medical

12   records from Dr. Jordan showed 6 visits between March and December 2011.  (AR 543-48.)

13   The records showed that she was continually prescribed Percocet.  (Id.)

14   24.    On December 8, 2011, Dr. Jordan performed a Transforaminal Epidural Block

15   at the C1-3 levels.  (AR 625.)  Dr. Jordan stated that the indications for the procedure were:

16                The patient has radicular pain in a C1, C2, C3 distribution, right

17                side. She has failed analgesics and anti-inflammatory agents and

18                a variety of other medications.  The pain is severe, disabling and

19                going on for months. We are going to perform a block using a

20                transforaminal approach at the fracture at the levels to see if we

21                can achieve some better level of pain control.

22   (Id.)

23   25.    In January 2012, Unum contacted Dr. Kelly, who provided reduced work

24   restrictions until March 2012.  (AR 553.)

25   26.    An office note from Dr. Jordan, dated February 27, 2012, states that Plaintiff

26   obtained 50% relief from the nerve block injections for 45 days.  (AR 624.)

27   27.    On April 11, 2012, Dr. Jordan performed a radiofrequency rhizolis procedure

28   to treat Plaintiff's pain.  (AR 914.)  The Operative Report from this procedure stated:

1      The patient had many weeks of relief with block of the C1, C2

2      and C3 dorsal root ganglia, however, with return of symptoms

3      including radicular pain in the above distribution.  She comes in

4      for a radiofrequency procedure of the dorsal root ganglia and to

5      see if we can achieve longer lasting results. She has failed

6      analgesics and anti-inflammatory agents. The problem has been

7      severe and disabling.

8   (Id.)

9          28.      While the Operative Report indicated that Dr. Jordan's "impression" was that

10  it was a "successful procedure," he subsequently advised plaintiff's neurosurgeon, Dr. Kelly,

11  that the rhizolysis procedure did not provide "any relief."  (AR 990.)

12         29.      Six weeks later, on June 1, 2012, Dr. Jordan reported that Hertan still had

13  occipital neuralgia and cervical radiculopathy and could not work on a full-time basis.  (AR

14  699.)  He restricted her from keyboarding activity and sitting for more than 4-5 hours a day.

15  (Id.)  Plaintiff consulted with Dr. Jordan on June 19, 2012, and his office notes indicated that

16  he continued to prescribe Percocet.  (AR 913.)

17         30.      On June 5, 2012, Unum conducted a "roundtable" meeting with claims

18  personnel. (AR 708.)  The record from the "roundtable review" stated that the medical

19  support for plaintiff's restrictions and limitations was "unclear."  (Id.)

20         31.      Unum requested medical records from Dr. Jordan on June 13, 2012.  (AR

21  728.)  Dr. Jordan sent in his records on the same day.  (AR 731-33.)  On June 26, 2012,

22  Plaintiff advised Unum that she consulted with Dr. Jordan on June 19, 2012.  (AR 746).

23  Plaintiff told Unum that despite the two nerve blocks, she still had pain and was still taking

24  Percocet on a daily basis.  (Id.)  She said she could not work while she was on pain killers

25  and that her doctors were continuing to explore treatment options.  (Id.)

26         32.      In July 2012, Unum requested from Dr. Jordan a copy of "only" Plaintiff's

27  MRI.  (AR 778, 786.)  By limiting the request to "only" the MRI, Unum did not request or

28  obtain the record of Hertan's June 19, 2012 office visit with Dr. Jordan.  (AR 856.)

33.     At about the same time, Unum requested plaintiff's pharmacy records. Despite a request for records from January 1, 2011 to the present, Unum only received reports for two months:  September 2011 and August 2012.  (AR 865.)  Unum's claim representative detected the missing records and suggested that a new request be initiated if pharmacy records were to be considered in connection with the claim.  (Id.)

34.     Unum conducted another roundtable of its claims personnel on August 15, 2012.  (AR 799-800.)  The claims personnel concluded that it was "unclear" if an impairment existed to preclude Plaintif from full time employment.  (AR 800.)

35.     Unum referred the matter to Dr. Trent Thomas, an in-house reviewing physician.  The claim representative asked Dr. Thomas whether he wanted complete records before he conducted his review.  (AR 856.)  Dr. Thomas advised that he would review the available records prior to deciding if he needed the record of Plaintiff's June 19, 2012, office visit with Dr. Jordan.  (Id.)

36.     Nancy Smith, the claim representative, spoke with Hertan on September 18, 2012, to inquire about her medication usage.  (AR 873.)  Plaintiff reported that she took Percocet 7.5/325 twice a day, later in the day.  She reported that she took more pain medication on the weekends since she was not at work.  (Id.)  Unum's notes of the call indicate that Plaintiff feels that she "cannot work full time as the pain makes it difficult to work and concentrate."  (Id.)  Plaintiff informed Unum that she "hopes that there is some treatment that she can have that will allow her to return to work" and that the procedures she had tried had not provided relief but that she hoped there was something else she could try to make the pain go away.  (AR 873-74.)

37.     Dr. Thomas reviewed the available records on September 19, 2012.  His report does not reference the September 19, 2012, conversation between Ms. Smith and Plaintiff regarding plaintiff's medication usage.  He stated that the "medical file"  did not document that medication side effects were a "significant issue."  (AR 867-72.)

38.     Dr. Thomas stated that Hertan's pain symptoms had not resulted in a referral to a pain management specialist.  (AR 871.)[2]  Dr. Thomas observed that the available medical records, which did not include the notes of Plaintiff's June 19, 2012, office visit with Dr. Jordan, "indicate no follow-up with treating neurologist, Dr. Jordan, since 'successful procedure' of radiofrequency rhizolysis" in April 2012.  (Id.)

39.     Unum then referred the claim to another in-house neurologist, Dr. Alan Neuren, for review.  Dr. Neuren's report stated that the "records from Dr. Jordan indicate a good response to the epidural blocks with resultant rhizotomy."  Dr. Neuren stated that there was "poor documentation" as to whether Ms. Hertan took medication, "how much and for how long."  (AR 879).  Dr. Neuren concluded that there was no support for impairment beyond April 25, 2012 (two weeks past the April 2012 radiofrequency rhizolysis procedure).  (Id.)

40.     On October 1, 2012, a Unum vocational reviewer, Thomas Waymire, provided an analysis of whether plaintiff could perform her occupation.  In doing so, the vocational representative relied on the opinions of Drs. Thomas and Neuren.  (AR 886.).  Despite the extensive listing of the cognitive requirements of the occupation, Mr. Waymire's analysis focused on Plaintiff's ability to lift, carry, push, pull, or otherwise move objects.  (Id.)  Mr. Waymire's analysis does not specifically address whether Plaintiff could practice law, with superior judgment and without supervision, while on narcotic medication.  (Id.)

41.     Unum terminated Plaintiff's benefits on October 4, 2012.  (AR 892-97.)  In the termination letter, Unum advised Hertan that its physicians determined that she could work full-time two weeks after her April 2012 radiofrequency rhizolysis procedure.  Unum advised Hertan that her medical management had been stable and unchanged since May 2011, that the records from Dr. Jordan indicated she had a "good response" to her epidural

---

[2]     Plaintiff contends that this conclusion is incorrect because Dr. Jordan is a pain management specialist.  Dr. Jordan possess ABMS Board Certification in Nuerology, Pain Medicine, and Clinical Neurophysiology.  (AR 990.)

blocks and rhizotomy, and that there was "poor documentation" of whether she took anything for pain, how much, and for how long.  (AR 894.)

42.   On the same day as the termination letter, Unum received a completed questionnaire by Dr. Jordan.  (AR 907-09.)  Dr. Jordan also submitted updated records, including the April 2012 Operative report, the June 19, 2012, medical record, reflecting continued treatment with Percocet, and an October 4, 2012, office note showing there had been no relief from the rhizolysis procedure.  (AR 911-17.)  He stated that Hertan could not work full time because extended sitting at a work station stimulated pain.  He further stated that even sedentary activity resulted in pain requiring opiates.  (Id.)

43.   Dr. Thomas reviewed this information and stated it did not change his opinion.  His stated "Analysis/Rationale" was that there was "no new physical examination findings, diagnostic test results or change in treatment [] evident per updated medical information which would support stated R/L's."  (AR 917.)

44.   Dr. Neuren reviewed the updated medical information.  He also did not change his opinion.  He stated that there was "no support that 'sedentary activity' would aggravate pain.'"  He also stated that the "records previously reviewed" [did] not reveal that the insured [was] using medication for pain."  (AR 920.)

45.   Plaintiff submitted an appeal to Unum on April 12, 2013, and an addendum in support of her appeal on May 11, 2013.  (AR 981-85, 1013-15.)  The appeal included updated medical records from Dr. Jordan, Dr. Kelly, and Dr. Kelly's colleagues, Drs. Aaron Cutler and Garni Barkhoudarian.  (AR 1017-44.)  Plaintiff also submitted pharmacy records establishing that she had been consistently prescribed narcotic pain medications beginning in October 2010 and continuing through April 2013.  (AR 1046-53.)

46.   In her appeal, Hertan explained:

My pain interferes with my ability to think, concentrate, analyze, focus, and work, among other things, and prevents me from performing my job duties on a full-time basis.  The pain also interferes with my ability to sleep, which causes me to be fatigued, which also interferes with my

1     ability to work.  As I work during the day, the pain increases to the

2     point where it prevents me from working and requires that I take pain

3     medication to alleviate the pain.  As a result, I am only able to perform

4     my job duties on a part-time basis.  Percoset [sic] makes me drowsy,

5     dizzy, and unable to concentrate and think clearly.  I am unable to drive

6     or perform my occupation as an attorney when I have taken Percoset

7     [sic].

8  (AR 1015.)

9     47.    Among the records submitted in support of Plaintiff's appeal was a report of

10  Hertan's September 21, 2012, office visit with Dr. Cutler.  (AR 1036.)  On that date,

11  Dr. Cutler determined that Plaintiff's ongoing pain could be caused by the hardware

12  implanted in her head.  (Id.)

13     48.    On October 4, 2012, Dr. Jordan recommended that Plaintiff undergo a more

14  aggressive rhizolysis procedure.  (AR 1024.)  Dr. Jordan stated that the previous rhizolysis

15  treatment had not resulted in any relief and opined that he may have "undertreated" her

16  condition to that point.  (Id.)

17     49.    Hertan opted for the second surgery, recommended by Drs. Kelly, Cutler, and

18  Barkhoudarian, which was performed on December 11, 2012.  (AR 1030-31, 1038.)

19  Plaintiff was discharged from the hospital on December 13, 2012.  (AR 1032.)

20     50.    The medical records submitted by Hertan in support of her appeal showed that,

21  at the time of Unum's termination of benefits, her medical condition was described by her

22  physicians as follows:

23     •    9/21/12:  (Dr. Cutler):  "The patient did well after surgery, however,

24     she developed severe right sided occipital pain.  The patient has been

25     evaluated by Dr. Sheldon Jordan for occipital neuralgia and has

26     received injections as well as radiofrequency treatment with minimal

27     relief . . . ."  (AR 1036.)

28

- 10/4/12: (Dr. Jordan): "Gaye had 45 days of relief with prior C1, 2, 3 block but did not get any relief from a subsequent RF [rhizolysis]. The latter was done with low intensity parameters to avoid anesthesia dolorosa (which is our published protocol) but we may have "undertreated" her condition.  I would propose a repeat RF with slightly higher temperatures and also separate RF of the dorsal branches. Hyaluronidase can also be injected to try to free up any scar related nerve entrapment."  (AR 1024.)

- 10/5/12: (Dr. Kelly): "She returns now after recently being seen on 9/21/12 for ongoing relatively severe right sided occipital pain which is daily and is interfering with her work as an attorney. . . .  A head CT with reconstructions was done at her last visit and this study shows the titanium plate and screws at the operative site and it appears that at least one of the screws may have partially backed out of position and may be loose leading to her pain . . . ."  (AR 1038.)

- 12/3/12: (Dr. Cutler): "[C]onsidering the multiple treatment modalities the patient has undergone, it is possible that her pain is directly related to the protrusion of this plate and that removing it would provide her some relief."  (AR 1026.)

- 12/21/12: (Dr. Barkhoudarian): "In the operating room, it was noted that there were 3 different screws that had backed out, and due to the bone flap fusing to the surrounding skull, one of the plates actually had bent under the force of the fusion.  All of these potentially could have been contributing to her pain syndrome, and therefore we removed those loose screws and removed 2 of the plates that were on the inferior aspect in the location of her pain." (AR 1034.)

51.     On December 20, 2012, Dr. Jordan reported that Plaintiff was still experiencing pain that was not adequately treated with short-acting opioids.  He prescribed OxyContin, in addition to Oxycodone.  (AR 1019.)

52.     Following the surgery, Dr. Barkhoudarian examined Plaintiff on December 21, 2012.  (Id.)  Dr. Barkhoudarian noted that Hertan was still complaining of "notable pain" 10 days after the surgery.  Dr. Barkhoudarian advised Plaintiff that he anticipated that her pain would improve over the next several months, and that although he hoped the pain would improve, Plaintiff "may always have a sensation in that region that should not be confused with pain."  (Id.)

53.     After Plaintiff had a follow-up examination with Dr. Barkhoudarian on April 25, 2013, Dr. Barkhoudarian made the following entry in the office notes:

> This patient is a 52-year old woman who is now 2-1/2 years
> postop from her left cerebellar meningioma resection and 4-1/2
> months postop from hardware removal, causing significant lesser
> auricular neuralgia.  Her pain has not improved despite the
> hardware being removed and it is potentially due to neuroma
> being developed, however, we would like to continue to monitor
> this conservatively for now along with Dr. Sheldon Jordan and
> we would reassess her in an additional 3 months' time to see if
> there is any improvement of her pain.  This has . . . significantly
> interfered with her ability to work and therefore she is on partial
> disability.

(AR 1160.)

54.     Dr. Jordan wrote a letter on April 30, 2013, to "clarify misconceptions on the basis of the insurance company regarding [Hertan's] disability status."  (AR 1017.)  Dr. Jordan's letter stated:

> This patient had a tumor resection from her right posterior fossa
> resulting in a neuralgia that has been severe responding

-14-

incompletely to opiates taken on a daily and regular basis.  The opiates include Percocet and OxyContin which results in impaired ability to focus, impaired concentration and impaired short-term memory function.  At best she can only work at half of her regular pace in her work as an attorney.  In other words, from a cognitive standpoint, she is at least 50% impaired.

From a physical standpoint she has a number of elements in her activities at work that produce worsened pain and further impair concentration directly and indirectly due to resulting increased usage of opiates.  These challenges include eight hours a day on a computer, 2 to 5 hours a day on a telephone, lifting files up to 20 pounds, and repeated reaching, grasping, and fingering in dealing with files and other materials in her work as an attorney.  Her neck and headache pains are worsened by all of these activities.  As a result, at this juncture, [it] is my experience with this particular patient as well as my experience of more than 30 years in practice that she should limit her computer work to approximately 2 hours a day, telephone work should be minimized and she should use a headset.  She should have a limit to lift less than 10 pounds at a time.  Reaching, grasping, [and] fingering should be likewise limited to only rare or occasional.

The above limitations and disabilities have been in effect since October 2010 and it is my expectation that they will be a continued source of disability through at least December 2013.  The patient did not respond to her repeat neurosurgery nor to

radiofrequency to help alleviate her neurpathic pain.  She
responded incompletely to medications.

(Id.)

55.    Unum's appeal representative contacted Plaintiff on May 23, 2013.  (AR 1078.)  Hertan reported that she still had a lot of pain every day, and that her doctors had told her to give it more time before they could tell if the December 2012 surgery was successful.  (Id.)

56.    On June 5, 2013, Unum referred Plaintiff's appeal to Dr. Charles Sternbergh, a neurosurgeon employed full-time by Unum, to conduct a medical review of the file.  (AR 1172.)

57.    Dr. Sternbergh completed his review on June 19, 2013.  (AR 1172-75.)  Dr. Sternbergh concluded that Plaintiff was able to lift 10 pounds, and frequently sit and keyboard, with occasional standing on a full time basis, 2 to 4 weeks after her December 2012 surgery.  (AR 1174.)  Dr. Sternbergh acknowledged that Ms. Hertan had been prescribed and used narcotic medication on a "regular basis" since March 2011.  (Id.)  Dr. Sternbergh stated that it was his opinion that "[p]hysiological habituation to [Percocet] has occurred" since she began taking the drug "such that adverse effects on cognition would be minimized."  (Id.)  According to Dr. Sternbergh:

> If the claimants cognition was impaired to prevent doing her job
> properly, she would be impaired whether she was working 20
> hours/week or her customary full time work hours.  Potentially,
> claimant's complaints of persistent pain and use of chronic
> narcotics could decrease her efficiency and production of work
> product, however no data has been presented to document this
> possibility.

(AR 1174-75.)  Dr. Sternbergh concluded that with habituation to Percocet "over time, and documentation of successful return to her occupation at 20 hours/week, there is no compelling evidence that she could not return to regular, full time hours as of 10/5/12.  It

should be noted that she would be out of work for an interval of recovery after surgical removal of the cranial hardware.  This surgery was an appropriate strategy to improve her complaints of persistent pain."  (AR 1175.)

58.     On June 25, 2013, Unum upheld its termination decision.  (AR 1178-83.) According to Unum, any restrictions or limitations that began in December 2012 "are not time-relevant to the date in question of October 5, 2012," when Unum initially terminated Plaintiff's disability insurance benefits as a "recurrent disability period" because she "did not return to full-time work" with her employer by October 5, 2012.  (AR 1180.)  Unum therefore affirmed its termination of Plaintiff's benefits and stated that her coverage ended effective October 4, 2012.  (Id.)

59.     Having exhausted her administrative remedies, Plaintiff commenced this action on July 9, 2014.

## II.   Conclusions of Law

1.     In a de novo review, "the burden of proof is placed on the claimant" to establish entitlement to plan benefits.  Muniz v. Amec Const. Mgmt., Inc., 623 F.3d 1290, 1294 (9th Cir. 2010).  "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  Id. at 1295-96.

2.     Where an administrator denies a claim for benefits "based on absence of some sort of medical evidence or explanation," the administrator is "obligated to say in plain language what additional evidence it needed and what questions it needed answered in time so that the additional material could be provided."  Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 680 (9th Cir. 2011).  "An administrator does not do its duty under the statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.'  Nor does it do its duty by elaborating upon its negative answer with meaningless medical mumbo jumbo."  Id.

3.     "[I]ndividual reactions to pain are subjective and not easily determined by reference to objective measurements."  Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872 (9th Cir. 2008); see also Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009) (relying on medical and pharmacy records as relevant "objective" evidence to use when assessing the severity of a claimant's reported pain); Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004) ("What is significant is the improbability that [the claimant] would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits.").

4.     Evidence of a subsequent procedure or event, when related to the disabling condition, may be probative of the disabling nature of the claimant's condition.  Silver v. Executive Car Leasing Long-Term Disability Plan, 466 F.3d 727, 735-36 (9th Cir. 2006).

5.     "When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures."  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 974 (9th Cir. 2006).

**III.   Analysis**

The Court concludes, after reviewing the Administrative Record, and considering the arguments and Trial Briefs submitted by the parties, that Plaintiff satisfied her burden to establish, throughout the relevant time period, that she was disabled under the terms of the Policy, because she was "limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury" and suffered "a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury."  (AR 151.)

Specifically, Plaintiff's course of treatment, beginning with her surgery in October 2010, and continuing through the plate removal surgery in 2012 and follow-up care in 2013, establishes that she persistently sought treatment options for her pain.  She was prescribed

narcotic medication by Dr. Jordan, who qualifies as a pain management specialist.  When the

narcotics did not provide sufficient relief, and interfered with her ability to return to work

full-time, Dr. Jordan performed a nerve block, and when that failed to provide permanent

relief, Plaintiff received a radiofrequency rhizolysis procedure.  When Plaintiff's plain

persisted, she underwent a second surgical procedure to remove the hardware that had been

implanted during the initial surgery to remove her brain tumor.  That hardware removal

surgery established that several of the screws had loosened and due to the bone flap fusing to

the surrounding skull, one of the plates had bent under the force of the fusion.  (AR 1034.)

According to her surgeon, these circumstances could have been contributing to her pain

syndrome.  (Id.)  This escalating pattern of treatments for persistent pain is exactly what

Unum's Dr. Lezberg said he would expect if Plaintiff's pain continued for more than a year

following her initial brain surgery.  (AR 418.)[3/]

       Throughout her claim, Hertan consistently explained that she could only work part-

time because her pain would get worse throughout the day until it reached a point where she

would need to take her narcotic pain medication.  Once taking the medication, she was

unable to work as an attorney because the medication made her tired, dizzy, and unable to

focus.  (AR 196, 248.)  Dr. Jordan repeatedly confirmed that the pain medication impaired

Plaintiff's cognitive functioning to the extent that it prevented her from returning to full-time

work as an attorney.  (AR 1017.)

       Rather than address the cognitive demands of Hertan's occupation as an attorney,

Unum consistently focused almost entirely on the physical requirements of what they

concluded was a "sedentary" occupation.  Although Unum's counsel in this litigation should

understand better than most the cognitive requirements of a practicing attorney, this focus on

the physical aspects of the job rather than the intellectual demands continued in Unum's

---

[3/]     The Administrative Record does not explain why Unum, when it was considering
terminating Plaintiff's benefits and denying her appeal, did not refer the file back to Dr.
Lezberg to reconsider his earlier conclusion that Plaintiff was disabled.  Instead, Unum
referred the file to other in-house and consulting physicians who ultimately concluded that
Hertan was not entitled to further benefits.

1    Trial Briefs.  (See Defendant's Opening Trial Brief 19:3-11 ("Vocational Consultant

2    Thomas Waymire reviewed the job description provided by Plaintiff's employer, Plaintiff's

3    file, and the Enhanced Dictionary of Occupational Titles, and determined that the demands

4    of Plaintiff's occupation do not exceed her physical capabilities. The occupation does not

5    require exerting over 10 pounds of force on an occasional basis, and allows for frequent or

6    constant sitting. According to Drs. Thomas and Neuren, Plaintiff can stand or walk up to 1/3

7    of the day, finger and keyboard on a frequent basis, and reach and handle on an occasional

8    basis. Within these restrictions, Plaintiff can perform the material and substantial duties of

9    her occupation.").)

10          Dr. Sternbergh's review on appeal is the only evidence in the Administrative Record

11   of a substantive attempt by Unum to evaluate Plaintiff's claimed cognitive impairment from

12   the pain she experienced and the narcotic medication she was prescribed.  (AR 1174.)

13   Although Dr. Sternbergh acknowledged that Hertan's "complaints of persistent pain and use

14   of chronic narcotics could decrease her efficiency and production of work product," he

15   discounted that possibility because "no data has been presented to document this

16   possibility."  (AR 1174-75.)  Importantly, Unum had never asked Hertan for data to support

17   the degree of cognitive impairment she experienced as a result of the pain and narcotic

18   medication.

19          Dr. Sternbergh also concluded that "[p]hysiological habituation to [Percocet] has

20   occurred" since she began taking the drug "such that adverse effects on cognition would be

21   minimized."  (AR 1174.)  This opinion is far less compelling than Unum suggests.  First, the

22   fact that Plaintiff may have become habituated to the Percocet to the extent that "adverse

23   effects would be minimized" does not convincingly establish that Hertan is capable of

24   performing her occupation after taking a does of the narcotics prescribed to her.  Even

25   minimal loss of cognitive abilities could, as Hertan and Dr. Jordan repeatedly stated, prevent

26   her from working full-time as an attorney while under the influence of Percocet.  Second, as

27   Dr. Sternbergh acknowledged, Hertan's "complaints of persistent pain and use of chronic

28   narcotics could decrease her efficiency and production of work product."  (AR 1174-75.)

1 Even if Hertan had habituated to the Percocet, such that it did not impair her cognitive

2 abilities, the pain alone would decrease Plaintiff's efficiency and production of work product

3 that she would be prevented from working full-time in her occupation without suffering the

4 required 20% drop in income to qualify as disabled under the policy.  Third, Dr. Sternbergh

5 does not appear to account for Hertan's practice of waiting until later in the day, once the

6 pain level has increased to the point that she cannot continue working, before taking the

7 Percocet.  Instead, his opinion appears to be based on the erroneous assumption that Hertan

8 was constantly on Percocet throughout the day.

9       The Court is not persuaded Unum's argument that because Plaintiff has worked up to

10 70% of the time without medication that there is no evidence that she cannot work the

11 additional 30%.  (Defendant's Opening Trial Brief 20:23-35.)  Unum's argument ignores

12 both the reasons for her disability and the type of benefits it promised to pay.  First,

13 Plaintiff's ability to work a full-time schedule was limited by the narcotic medication she

14 was required to take for her pain.  She worked until the pain became too severe and then

15 took her pain medication.  Once she took the medication, she stopped practicing law (and

16 driving) for the day.  Second, Unum's argument ignores that the Policy offered disability

17 coverage for both total and partial disabilities.  The fact that Plaintiff's cognitive impairment

18 from the pain and medication is not so severe that it prevents her from working at all is not

19 compelling evidence that she does not suffer from a partial disability.

20       Despite her continuing efforts at obtaining pain relief, Plaintiff's condition has not

21 improved since she was originally approved for benefits.  There is no evidence that her pain

22 has been alleviated, permitting her to return to work full-time.  Plaintiff met her burden of

23 proof at the time of her initial claim and with additional evidence, she has continued to meet

24 her burden of proof.  Plaintiff is therefore entitled to reinstatement of her benefits dating

25 back to October 5, 2012.

26 . . . .

27 . . . .

28 . . . .

-21-

1

**<u>Conclusion</u>**

2    For all of the foregoing reasons, the Court concludes that Plaintiff is entitled to

3    reinstatement of her partial disability benefits under the Policy dating back to October 5,

4    2012.  The Court will enter judgment in favor of Plaintiff.  The Court will issue a separate

5    order setting a schedule and procedure for a Motion for Attorneys' Fees.

6    DATED: June 9, 2015

7    _____

8                     Percy Anderson
                UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28